EXHIBIT B

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website: http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2),
AND 546(a) AND FED. R. BANKR. P. 7004, 9006(c), AND 9018 (i) AUTHORIZING
DEBTORS TO ENTER INTO STIPULATIONS TOLLING STATUTE OF LIMITATIONS
WITH RESPECT TO CERTAIN CLAIMS, (ii) AUTHORIZING PROCEDURES TO IDENTIFY
CAUSES OF ACTION THAT SHOULD BE PRESERVED, AND (iii) ESTABLISHING
PROCEDURES FOR CERTAIN ADVERSARY PROCEEDINGS INCLUDING
THOSE COMMENCED BY DEBTORS UNDER 11 U.S.C. § 541, 544, 545, 547, 548, OR 553

("PRESERVATION OF ESTATE CLAIMS PROCEDURES MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), submit this expedited motion (the "Motion") for an order (the "Order") under 11 U.S.C. §§ 102(1)(A), 105(a), 107, 108(a)(2), and 546(a) and Federal Rules of Bankruptcy Procedure 7004, 9006(c), and 9018 (i) authorizing the Debtors to enter into stipulations tolling the statute of limitations with respect to certain claims, (ii) authorizing procedures for the Debtors to identify causes of action that should be preserved and granting authority to abandon certain causes of action, and (iii) establishing procedures for certain adversary proceedings, including those commenced by the Debtors under 11 U.S.C. § 541, 544, 545, 547, 548, or 553, and respectfully represent as follows:

## Background

### A. The Chapter 11 Filings

1. On October 8 and 14, 2005, the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108. The Court has ordered joint administration of these cases.

2. No trustee or examiner has been appointed in these cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (together with the official committee of unsecured creditors, the "Statutory Committees").

3. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein are sections 102(1)(a), 105(a), 107, 108(a)(2), 502(d), 541, 544, 545, 546(a), 547, 548, and 553 of the Bankruptcy Code and Rules 7004, 9006(c), and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B. Current Business Operations Of The Debtors

5. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2006 had global net sales of $26.4 billion and global assets of approximately $15.4 billion.[1] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines,

---

[1] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2] On March 20 2007, Delphi Automotive Systems Espana S.L. ("DASE"), whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed a "Concurso" application for a Spanish insolvency proceeding. The application was approved by the Spanish court on April 13, 2007. On July 4, 2007, DASE, its Concurso receivers, and the Cadiz workers councils and unions reached a settlement on a social plan, the funding of which was approved by this Court on July 19, 2007. The Spanish court approved the social plan on July 31, 2007. The Concurso proceeding is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

3

and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer ("OEM").

7. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C. <u>Events Leading To The Chapter 11 Filing</u>

8. In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net

---

[3] Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which comprised charges related to the U.S. employee special attrition programs.

9. The Debtors believe that the Company's financial performance has deteriorated because of (i) increasingly unsustainable U.S. legacy liabilities and operational restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (ii) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (iii) increasing commodity prices.

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major stakeholders had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete its transformation plan and preserve value for its stakeholders.

D. The Debtors' Transformation Plan

11. On March 31, 2006, the Company outlined the key tenets of a transformation plan that it believed would enable it to return to stable, profitable business operations. The Debtors stated that they needed to focus on five key areas:[4] first,

---

[4] In furtherance of the Debtors' transformation plan, on December 18, 2006, the Debtors announced their execution of an equity purchase and commitment agreement with certain investors, and a plan framework support agreement with those investors and GM. On July 9, 2007, Delphi confirmed that it had formally terminated the equity purchase and commitment agreement and related plan framework

modifying the Company's labor agreements to create a competitive arena in which to conduct business;[5] second, concluding their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company;[6] third, streamlining their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus;[7] fourth, transforming their salaried workforce to ensure

---

support agreement but that it expected to enter into new framework agreements with plan investors presently. Subsequently, on July 18, 2007, Delphi announced that it had accepted a new proposal for an equity purchase and commitment agreement (the "Delphi-Appaloosa EPCA") submitted by a group comprising a number of the original plan investors (affiliates of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch, Pierce, Fenner & Smith Inc., and UBS Securities LLC) as well as, Goldman Sachs & Co. and an affiliate of Pardus Capital Management, L.P. (collectively, the "New Plan Investors"). Under the Delphi-Appaloosa EPCA, the New Plan Investors would invest up to $2.55 billion in preferred and common equity in the reorganized Delphi to support the Company's transformation plan and plan of reorganization. This Court approved the Delphi-Appaloosa EPCA on August 2, 2007.

[5] Among the progress made to date, on June 22, 2007, Delphi reached an agreement with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (the "UAW") and GM that (a) modifies, extends, or terminates provisions of the existing collective bargaining agreements among Delphi, the UAW, and its various locals, (b) provides that Delphi and GM will undertake certain financial obligations to Delphi's UAW-represented employees and retirees to facilitate these modifications, and (c) modifies retiree welfare benefits for certain UAW-represented retirees of the Debtors. This agreement, which was approved by this Court on July 19, 2007, should facilitate the Debtors' reaching consensual resolutions of their labor issues with the remaining unions and GM and permit the Debtors to continue to implement their transformation plan and to develop, prosecute, confirm, and consummate a plan of reorganization. As of August 6, 2007, similar agreements have been reached with the International Association of Machinists and Aerospace Workers and its District 10 and Tool and Die Makers Lodge 78, the International Brotherhood of Electrical Workers and its Local 663, International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communication Workers of America and its local unions, and Locals 832S, 18S, and 101S of the International Union of Operating Engineers. Delphi is currently engaged in settlement discussions with its remaining U.S. labor union and is working to conclude discussions with that union as soon as practicable.

[6] On July 9, 2007, Delphi confirmed that its discussions with GM on a comprehensive settlement agreement had entered the documentation phase and that it expected that a settlement with GM would be incorporated into the Debtors' plan of reorganization rather than filed with this Court for separate approval.

[7] In connection with their March 31, 2006 announced transformation plan, the Debtors classified "core" and "non-core" product lines and plants. The Debtors have been working to divest non-core assets so as to maximize the value of the estate for stakeholders. During the 2006 and 2007 calendar years, for example, the Debtors sold substantially all of the assets related to MobileAria, Inc., its chapter 11 affiliate, obtained court approval for the sale of substantially all of the assets of their brake hose and

that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint[8] and devising a workable solution to their current pension situation.[9]

12. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

---

Saltillo, Mexico brake plant businesses, and obtained court approval of bid procedures related to the upcoming sale of substantially all assets used in their catalyst business. In addition, as announced publicly, the Debtors anticipate selling additional non-core assets, including, without limitation, their steering, interior, and closures businesses.

[8] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan. The Debtors also made significant progress in ensuring that their organizational and cost structure is competitive in obtaining the entry of this Court's Order Under 11 U.S.C. § 363(b) And Fed. R. Bankr. P. 6004 Authorizing Debtors To Enter Into Finance Outsourcing Agreement on April 23, 2007 (Docket No. 7773) (the "Finance Outsourcing Order"). The Finance Outsourcing Order authorized the Debtors to outsource certain of the Debtors' accounts receivable, accounts payable, fixed assets, travel and expense reporting, general ledger, and contract administration processes and significantly reduce SG&A expenses as part of their transformation plan.

[9] To that end, on May 31, 2007, the Bankruptcy Court granted the Debtors' motion for authority to perform under the terms of those certain September 30, 2006 plan year funding waivers, which were approved by the IRS, for both the Delphi Hourly-Rate Employees Plan and the Delphi Retirement Program for Salaried Employees (collectively, the "Plans"). On July 13, 2007, the IRS modified the conditional funding waivers granted to Delphi related to the Plans, extending the dates by which Delphi is required to file a plan of reorganization and emerge from chapter 11 to December 31, 2007 and February 28, 2008, respectively.

E.  Revised Plan Framework Agreements And Preserving Estate Causes Of Action

13. The Debtors have made significant progress toward confirming a plan of reorganization: they have obtained the support of their Statutory Committees for and Court approval of the Delphi-Appaloosa EPCA, they have negotiated agreements with five of their six U.S. labor unions, they are engaged in the documentation phase for a comprehensive settlement agreement with GM, and they have scheduled a hearing in October 2007 to seek approval of their proposed disclosure statement and of solicitation procedures for a reorganization plan. The Delphi-Appaloosa EPCA approved by this Court on August 2, 2007 details the New Plan Investors' commitment to invest in the reorganized Delphi and attaches a proposed framework for a reorganization plan pursuant to which the Debtors expect to emerge from chapter 11 by the end of the year. The proposed treatment of claims under this reorganization plan would generally provide that all claims be paid or satisfied in full through distributions of cash, common stock, or both. Accordingly, avoiding preferential transfers would provide no benefit to the Debtors' estates because any party returning such a transfer would be entitled to a claim for the same amount, to be paid in full under such a plan. For the same reasons, avoiding statutory liens or prepetition setoffs would provide little to no benefit to the estates. As a result, the Debtors contemplate that their reorganization plan will waive or release most if not all avoidance causes of action.

14. At present, the Debtors estimate that they may have more than 11,000 potential preference claims arising from transfers totaling approximately $5.8 billion (before taking into account potential defenses such as transfers made in the ordinary course of business). The constructively fraudulent transfer reach-back period, made

applicable by Bankruptcy Code section 544(b) and state law, is generally six years under the law of Michigan and New York.[10] Thus, with a company of Delphi's size, there are literally hundreds of thousands of transactions that occurred during these constructively fraudulent transfer reach-back periods. Under the Bankruptcy Code, each Debtor has until two years after the entry of the order for relief to commence adversary proceedings asserting avoidance causes of action, as well as certain causes of action where the applicable statute of limitations has been tolled by the Bankruptcy Code during the initial two years of these chapter 11 cases.

15. Although the Debtors do not intend to pursue avoidance actions in light of their anticipated reorganization, as a precautionary measure they must preserve these actions in some manner. The Debtors have explored various alternatives to filing avoidance actions before the two-year deadline, such as executing tolling agreements with potential defendants. The logistical challenges of circulating and executing agreements with such a large number of potential defendants, however, make that solution impractical. The Debtors, therefore, must timely commence these actions or take other action in the coming months or risk losing forever potential causes of action that should be preserved.[11]

---

[10] By examining transactions during this reach-back period to identify potential fraudulent transfer claims that should be preserved, the Debtors do not concede that they were insolvent, undercapitalized, or unable to pay their debts as they became due at any time during the reach-back period.

[11] As noted above, Delphi has been in discussions with GM on a comprehensive settlement agreement that they anticipate incorporating into the Debtors' reorganization plan. Because of GM's unique role in these cases, in addition to filing a sealed complaint governed by the procedures sought in this Motion, the Debtors request leave for the Debtors and GM to file, under seal, a stipulation that contains tolling provisions, consistent with this Motion, and other agreements of the parties with respect to the sealed complaint involving GM, which stipulation shall be deemed "so ordered" and shall be sealed in accordance with the terms of the order sought herein.

16. Once these actions have been commenced, the Debtors will proceed no further and will not use them for any purpose while they focus on confirming a reorganization plan. The procedures proposed in this Motion are designed to permit the Debtors to preserve these claims while otherwise maintaining the status quo among all parties in interest. The causes of action would remain dormant and become relevant again only in the unlikely event that the Debtors do not timely emerge from chapter 11.

Relief Requested

17. As set forth in the proposed order attached hereto as Exhibit A, the Debtors seek to implement procedures applicable to Adversary Proceedings that will permit all parties to preserve the status quo as the Debtors are finalizing preparations for confirming a reorganization plan by year's end. By this Motion, the Debtors seek the following relief:

Tolling Agreement

- *Approval Of Form.* The Debtors seek court approval of a form of stipulation (attached as Exhibit B) which would, without further order of this Court, toll the applicable statute of limitations on claims against parties with whom the Debtors seek to enter into such stipulations.

- *Intercompany Tolling.* The Debtors also seek to have this Court "deem" all Debtors to have entered into a stipulation with each of the other Debtors and affiliated non-Debtor entities.

Approval Of Avoidance Evaluation Procedures And Authority To Abandon Claims

- *Preference Claims Below $250,000 In Value.* The Debtors request authority to abandon these preference actions. To the extent that these actions are against insiders or involve persons or transactions associated with the SEC investigation of the Debtors, the Debtors also will be authorized to abandon those actions after notice to the Statutory Committees. If a Statutory Committee objects within 10 days after service of the notice, the Debtors may bring the matter before this Court for a ruling on whether the proposed abandonment satisfies section 554(a) of the Bankruptcy Code.